E-FILED
Friday, 05 December, 2025  10:22:03 AM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| PETER M. BONUTTI, M.D., | ) | |
| *et al* | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | No. 25-cv-2320 |
| DOEHRING WINDERS & CO., LLP; | ) | |
| JEFFREY SPRACKLEN, CPA, | ) | |
| STEVEN M. WENTE, CPA, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

Plaintiffs Peter M. Bonutti, M.D., Simone K. Bonutti, Bonutti Holdings, LLC,  P Tech, LLC, Bonutti Research, Inc., and the Trust Plaintiffs identified below, by and through their attorneys, LOFTUS & EISENBERG, LTD., for their Complaint against Defendants Doehring Winders & Co., LLP ("DW"), Jeffrey Spracklen, CPA ("Spracklen"), and Steven M. Wente, CPA ("Wente"), state as follows:

### I.    PARTIES

#### A.  Individual Plaintiffs

1.    Plaintiff, Peter M. Bonutti, M.D. ("Dr. Bonutti") is a citizen of the State of Florida, domiciled in Manalapan, Florida. Dr. Bonutti is a world-renowned orthopedic surgeon, inventor, and entrepreneur who holds over 500 U.S. patents.

2.    Plaintiff, Simone Bonutti is a citizen of the State of Florida, domiciled in Manalapan, Florida. Simone Bonutti is the spouse of Dr. Bonutti and filed joint tax returns with Dr. Bonutti during all relevant periods.

#### B.  Entity Plaintiffs

3.    Bonutti Holdings, LLC is a Delaware limited liability company authorized to transact business in Illinois. Bonutti Holdings is held by six revocable trusts that are grantor trusts for income tax purposes with the balance titled to Peter Bonutti's revocable trust, which

1

is a trust commonly used for probate purposes in Florida. Under the tax laws of the United States, Bonutti Holdings, LLC is a disregarded entity for tax purposes and all taxable income flows through to Dr. Peter Bonutti individually. Bonutti Holdings, LLC has largely been operated by Peter Bonutti from the State of Florida since 2014.

4. The Peter M. Bonutti 2011 Irrevocable Trust (the "2011 Irrevocable Trust") is a trust established for the benefit of Dr. Bonutti's family members. The co-trustees of the 2011 Irrevocable Trust are Mia Bonutti and Marc Bonutti, who are residents of the state of Florida and Magda Szabo is a citizen of and domiciled in Connecticut.

5. The Boris Bonutti 2003 Family Trust is a trust established for estate planning purposes. The co-trustees of the trust are Marc Bonutti, Mia Bonutti and Magda Szabo.  Marc and Mia are citizens of and domiciled in Florida.  Magda Szabo is a citizen of and domiciled in Connecticut.

6. The Magda Szabo 2003 Family Trust is a trust established for estate planning purposes. The co-trustees of the trust are Marc Bonutti, Mia Bonutti and Magda Szabo.  March and Mia are citizens of and domiciled in Florida.  Magda Szabo is tax resident in Connecticut.

7. The Miriam Killiany 2003 Family Trust is a trust established for estate planning purposes. The co-trustees of the trust are Marc Bonutti, Mia Bonutti and Magda Szabo. Marc Bonutti and Mia Bonutti are citizens of and domiciled in Florida.  Magda Szabo is a citizen of and domiciled in Connecticut.

8. The Henrick Bonutti 2003 Family Trust is a trust established for estate planning purposes. The co-trustees of the trust are Marc Bonutti, Mia Bonutti and Magda Szabo. Marc Bonutti and Mia Bonutti are citizens of and domiciled in Florida.  Magda Szabo is a citizen of and domiciled in Connecticut.

9. P Tech, LLC, a Delaware limited liability company, whose only member is Bonutti Holdings, LLC whose citizenship is detailed above.

10. Bonutti Research, Inc. is a Delaware corporation wholly-owned by Dr. Bonutti and doing business in Florida.

11. The Bonutti Family GST Trust dated April 1, 2004 is a grantor trust established for estate planning purposes. The co-trustees of the trust are Marc Bonutti, Mia Bonutti and Magda Szabo. Marc Bonutti and Mia Bonutti are citizens of and domiciled in Florida. Magda Szabo is a citizen of and domiciled in Connecticut.

12. Peter M. Bonutti, as Trustee of the Declaration of Trust Dated November 13, 2004, as amended is a revocable or disregarded trust established for probate purposes. All the trust plaintiffs (collectively, the "Trust Plaintiffs") are grantor trusts for which, under IRC Sections 671-678, all income is required to be reported directly on the grantor's individual income tax return, rendering annual separate filings of Form 1041 U.S. Income Tax Return for Estates and Trusts unnecessary.

13. Under Illinois law, trusts may sue and be sued in their own names. 735 ILCS 5/2-1005. Each Trust Plaintiff has capacity to maintain this action in its own name. The trustees identified above bring this action on behalf of their respective trusts.

## C. Defendants

14. Defendant Doehring Winders & Co., LLP ("DW") is an Illinois limited liability partnership with its principal place of business in Effingham, Illinois. DW is a certified public accounting firm that provided comprehensive accounting, tax preparation, and advisory services to Plaintiffs from approximately 1989 through 2021.

15. Defendant Jeffrey Spracklen, CPA ("Spracklen") is a citizen of the State of Illinois, domiciled in Effingham County, Illinois. Spracklen is a certified public accountant licensed in Illinois who was primarily responsible for the day-to-day management of Plaintiffs' engagement with DW. Spracklen personally prepared or supervised the preparation of tax returns, several of which had errors or were filed late or without prior client authorization,

created misleading or unsubstantiated accounting entries, made material misrepresentations to Dr. Bonutti, and failed to properly inform Dr. Bonutti as to salient tax and accounting matters.. In October of 2021, after Bonutti discovered that his 2020 individual income tax return had not been filed by the extended due date, Spracklen disclosed to Bonutti that he lacked the capability to appropriately handle his work.

16.     Defendant Steven M. Wente, CPA ("Wente") is a citizen of the State of Illinois, domiciled in Effingham County, Illinois. Wente is the managing partner of DW and a certified public accountant licensed in Illinois. Wente was responsible for firm management, engagement acceptance, and quality control. In late 2021, Wente admitted to Dr. Bonutti that DW "lacked the capability" to handle Dr. Bonutti's tax matters—but only after years of systematic failures and only when confronted about unfiled returns.

## II.     JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because complete diversity of citizenship exists between Plaintiffs and Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiffs seek damages exceeding $5,481,999, plus treble damages under the Illinois Consumer Fraud Act, punitive damages, disgorgement of fees, and attorneys' fees, placing the amount in controversy well above the jurisdictional threshold.

18.     Complete diversity exists because: (a) all individual Plaintiffs are citizens of Florida; (b) Bonutti Holdings, LLC is a citizen of Delaware and Florida; (c) all Trust Plaintiffs are citizens of Florida or Connecticut through their trustees; and (d) Bonutti Research Inc., is a citizen of Delaware and Illinois and (e) all Defendants are citizens of Illinois.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, including DW's provision of professional services from its Effingham, Illinois office.

4

### III.   FACTUAL ALLEGATIONS

### A. Professional Engagement and Scope of Services

20.     Beginning in approximately 1989, DW served as the exclusive accountant for Dr. Bonutti, his family members, and his various business entities. DW's comprehensive engagement encompassed tax return preparation for individuals and entities, financial statement preparation and bookkeeping, tax planning and advisory services, entity structuring and compliance, and representation before the IRS on tax matters.

21.     DW accepted responsibility for highly complex tax matters including international tax compliance, R&D credits, partnership taxation, S-corporation requirements, and multistate income allocation and filing obligations. At no time during the engagement did DW inform Dr. Bonutti that any aspect of his tax matters exceeded the firm's capabilities.

22.     Dr. Bonutti paid DW substantial professional fees throughout the engagement, reasonably relying on DW's representations of professional competence and their fiduciary obligations as his accountants and trusted business advisors.

23.     Spracklen took over from the original engagement partner who passed in 2015 and personally signed engagement letters with Plaintiffs that explicitly stated, among a long list of services that DW was retained to "render necessary accounting adjustments" and "advise on unclear tax law issues in favor of the client." Spracklen personally handled or supervised all bookkeeping and accounting matters for all Bonutti-owned entities and trusts demonstrating that DW functioned as Dr. Bonutti's outsourced CFO with comprehensive oversight of all financial transactions and regulatory obligations. Engagement letters personally signed by Spracklen, detailed a very broad scope of services including, but not limited to. monthly bookkeeping, financial statements, and preparation of proper federal and state tax returns.

24.     At all times relevant hereto, Peter Bonutti did not have an independently trained in-house bookkeeper or certified public accountant on his staff.  At all relevant times herein,

DW and Spracklen were aware of the foregoing.  Consistent with the representations in the engagement letter, Jeff Spracklen and DW, Dr. Bonutti fully relied on DW and Jeff Spracklen for all accounting (bookkeeping), associated advisory, and tax matters.

25.    Spracklen and DW handled the preparation of Plaintiffs' tax returns, undertook tax positions and compliance matters,  failed to respond to IRS correspondence, authorized or otherwise agreed to improper partnership distributions that were not consistent by the provisions any operating agreement coupled with recording "equity" on tax returns for a partner who made no capital contributions and was issued profits only interests, fabricated accounting entries without economic substance or lacking basis in accounting and tax rules, failed to timely file tax returns, failed filed tax returns without even required client notice or authorization, failed to notify or discuss tax and bookkeeping anomalies with Plaintiff who was the signer on all the engagement letters and failed to provide the competent, professional services advertised by his firm.

26.    Spracklen's oversight of tax and accounting matters for the Bonutti entities was so grossly incorrect in that he accounted for Dr. Bonutti's share of profit permitting distributions to him only after expenses were considered but allowed for accounting and distributions to a minority "profits only" partner as a component of gross receipts or otherwise whenever a distribution was requested. He further booked an "equity" account for the same partner despite no capital contributions being made.

27.    Spracklen booked "loans" despite no documentation establishing same or even any interest being accrued or paid, and moved cash from entity to entity or distributions without verifying the appropriateness of entries with appropriate parties or execute tax entries based in information he should have known being the supervisor of bookkeeping matters

28.    Despite having no basis in tax or accounting rules for such activity, and obvious disparity in treatment under any disparities in viz., cash distributions, capital contributions,

income allocations, and issues with general tax accounting, Dr. Bonutti was never notified as to any anomalies or issues on reporting or tax rules.  Dr. Bonutti was also never notified as to any late filings of returns.

29.     As the sole accountants retained to provide oversight in all matters, they failed to make any inquiries with Dr. Bonutti, align accounting entries with appropriate business activity, or report activity in the appropriate entity. Similarly, distributions and capital accounts for passthrough entities were not properly reported.  (Even in recent correspondence, entries are booked with a justification that this is what a "client wants" vs a justification premised on tax and accounting rules. Even recently issued 1099s received in 2025 by Plaintiff's new tax team evidenced gross errors in reported amounts.)

30.     Despite signing the engagement letter, Dr. Bonutti was never contacted or informed as to salient tax accounting matters including non pro rata contributions, distributions for his business entities, recording of loans that were not evidenced by any documents or stated intent from Dr. Bonutti, and/or appropriate parties including attorneys, relative to settlements.

31.     Per returns issued by Spracklen and DW, Dr. Bonutti was reported as having a foreign bank account totaling approximately $1,000,000 when he had only a single foreign bank account averaging a balance of $100,000.  He further failed to report interests in offshore partnerships, offshore loans and entities as required under FATCA rules.

32.     Spracklen personally mischaracterized a routine IRS identity verification notice which ultimately involves only adding the IRS provided code to the input on a tax return to e-file as "identity theft" to conceal his late filing.  As a result, Dr. Bonutti and his new accounting team spent years to obtain a refund of a very large tax overpayment (he had previously required Dr. Bonutti to overpay) on the tax return and clear up the notice which, due to failure of Spracklen and DW to respond timely, resulted in IRS freezing the tax refund/overpayment for years.

33.     Spracklen personally provided "grossly exaggerated and wrong gross receipts" figures when confronted with his failure to address a tax savings "change in method of accounting" for receivables under the 2017 TCJA. Only with the involvement of the current CPA and insistence by Dr. Bonutti was this change in method effectuated albeit a year late depriving Dr. Bonutti of an earlier refund and implementation of significant cash basis tax savings on the 2018 tax return and not just the 2019 tax return.

34.     Spracklen further failed to adjust for changes in method for treatment of inventory as supplies as permitted under the 2017 TCJA. This would have yielded significant tax savings for treatment of inventory on a cash basis.

35.     Spracklen personally claimed to handle R&D credits in-house as an area of his expertise, but the result was a significantly reduced tax credit. Each of these acts constitutes individual professional misconduct for which Spracklen is personally liable under Illinois law.

36.     Documentary evidence establishes Spracklen's personal involvement in specific misconduct. An October 2021 email from Spracklen to Dr. Bonutti mentioned only waiting on a K-1 for the 2020 return while deliberately concealing that the 2019 return remained unfiled for over thirteen months past the extended deadline of October 15, 2020.

37.     In November 2021, Spracklen personally e-filed the 2019 return without authorization, and when confronted, admitted that he had done so, claiming he had forwarded the e-filing consents to Dr. Bonutti, but that Dr. Bonutti never returned them. Dr. Bonutti has no record of receiving any such consent or copy of a tax return to review. This documentary evidence establishes Spracklen's personal knowledge and personal action in the unauthorized filing and subsequent concealment.

38.     Spracklen failed to timely file or extend the six children's returns in tax year 2020 and they were not filed until 2022.

**B. Grantor Trust Disaster: 18 Years of Unnecessary Filings**

39.     For eighteen years (2003-2020), DW filed entirely unnecessary separate tax returns for six grantor trusts. These trusts were wholly grantor-owned trusts for which 26 U.S.C. § 671 requires all income to be reported on the grantor's individual return.

40.     Treasury Regulation 26 C.F.R. § 1.671-4 explicitly states that trustees "may, but are not required to" file Form 1041 for wholly grantor-owned trusts. DW chose the option that maximized both client taxes and DW's fees.

41.     Bonutti Holdings, LLC is a disregarded entity whose income is reported on Dr. Bonutti's personal tax return.  Bonutti Holdings was not required to file partnership tax returns. DW chose to file partnership tax returns for Bonutti Holdings even though there was no requirement to do so.

42.     For eighteen years (2003-2020) DW filed incorrect and completely unsubstantiated partnership tax returns for Bonutti Holdings as this was an entity completely disregarded for federal income tax purposes and certainly not a partnership under any tax rules charging plaintiff for preparing and filing such returns.

43.     By filing unnecessary partnership tax returns for Bonutti Holdings, LLC, Illinois replacement tax was incurred and paid by Bonutti Holdings. Such taxes are not assessed on individuals.  Cancelled checks totaling $151,586 paid to the Illinois Department of Revenue for 2018-2021 prove the taxes were actually paid: $40,286 (2018), $36,546 (2019), $31,259 (2020), and $43,495 (2021).  Properly, since Bonutti Holdings is a disregarded entity, all income should have been reported directly on Dr. Bonutti's 1040.

44.     But for DW's unnecessary filings, Dr. Bonutti would not have incurred professional fees for preparing returns that should never have been prepared. Using conservative estimates of $5,000 per return annually, DW charged approximately $35,000 per year for seven unnecessary returns (six grantor trusts plus Bonutti Holdings), totaling $140,000

9

for the 2018-2021 period alone.  In addition, given the issuance of Schedules K1 by DW for Bonutti Holdings partnership tax return information had to be input twice over – once at the partnership level and again at the individual level - unnecessarily driving up service costs for individual income tax return preparation.

### C. $2,000,000 TCJA Disaster: Missed Accounting Method Change

45.     The Tax Cuts and Jobs Act of 2017 significantly expanded the threshold for businesses to use cash-basis accounting from $10 million to $25 million in gross receipts. This created an opportunity for Joint Active Systems, Inc. ("JAS") to change from accrual to cash-basis accounting, generating substantial tax benefits through a Section 481 adjustment.

46.     JAS Qualification: Specific Facts Establishing Eligibility. JAS had historically used accrual accounting due to gross revenue size under the previous $10 million threshold. However, actual controlled group gross receipts were below $25 million, making JAS eligible under TCJA's expanded threshold. These gross receipts figures were available in DW's own workpapers from years of all Bonutti group returns and underlying financial statements.

47.     The TCJA opportunity was not identified by DW. Instead, it was identified by Dr. Bonutti's sister, Magda Szabo, CPA, in summer 2020 when Dr. Bonutti was having a conversation with her. Ms. Szabo is a Director of Tax Services (Partner) at Berkowitz Pollack Brant Advisors + CPAs, with over 30 years of experience in international and domestic tax matters.

48.     When Ms. Szabo raised the accounting method change opportunity, Spracklen initially resisted, providing "grossly exaggerated and wrong gross receipts" figures to claim JAS was ineligible based on the controlled group having over $25 million in gross receipts. These figures were demonstrably false when compared to actual financial records in DW's possession.

49.     There was significant pushback by Spracklen when the issue was raised when he further falsely claimed that there wouldn't be much of a difference because the effective tax rate at issue was so low, a significant tax saving would not be realized. Similarly, this statement was not based on accurate facts.

50.     Only after being conclusively proven wrong and insistence by Dr. Bonutti, did DW belatedly implement the accounting method change for tax year 2019. By this time, the opportunity for carryback refunds to 2016-2017 had been permanently lost, since the method change could only generate prospective benefits rather than immediate cash refunds.

51.     Proximate Cause and Damages. Had DW timely implemented the accounting method change for 2018, JAS would have taken an IRC Section 481 adjustment generating approximately $2,000,000 in NOLs. Under law then in effect, these NOLs could have been carried back to prior tax years (2016-2017), generating immediate cash refunds. There was no carryback undertaken by DW and the window closed. Lost refunds total $2,000,000, plus approximately $50,000 in lost investment returns during the delay period.

**D.  Lantz Settlement Fabrication: The $2,375,560 Fictitious Commission**

52.     Bonutti Research Inc. ("BRI") was the holder of five patents that Lantz Medical ("Lantz") infringed. Joint Active Systems, Inc. ("JAS") was only the licensee of the patents. In its capacity as title holder, BRI paid for all attorneys' fees incurred during litigation.  These amounts were substantial and easily noticed.  Moreover, these are facts that DW in their capacity as both the primary accountant and advisor was or should have been fully aware of. In 2017, Lantz agreed to pay BRI $2,375,560 to settle the patent infringement lawsuit.

53.     Due to an administrative error, the settlement agreement erroneously listed the bank account information for JAS instead of BRI. Lantz paid the full settlement via wire transfer to JAS.

11

54.    The wire transfer error presented a straightforward accounting problem with an obvious solution: prepare journal entries transferring funds from JAS to BRI, or at minimum, record an intercompany payable from JAS to BRI with a corresponding receivable on BRI's books, followed by an actual cash transfer.

55.    Instead of implementing this elementary correction, Spracklen intentionally fabricated a fictitious "commission" expense on BRI's books equal to the entire $2,375,560 settlement amount. BRI's 2017 tax return showed approximately $2,375,560 in income and an equal "commission to JAS" expense—a fabricated transaction with absolutely no basis in reality: (a) no commission agreement existed between BRI and JAS; (b) no prior pattern of commission payments existed; (c) JAS provided no brokerage or commission services to BRI; and (d) BRI never paid JAS a commission on any matter.

56.    DW never discussed this accounting treatment with Dr. Bonutti. The only "client" authorization defense counsel cited was a bookkeeper—certainly not the principal shareholder who signed the engagement letters. Accounting and tax reporting are governed by GAAP and tax law, not "client wishes."  In addition, DW, as the accountant of record, should have been aware independently of the expenses associated with income and properly recorded the income.

57.    Dr. Bonutti owned 85% of BRI but only 75% of JAS. By allowing settlement proceeds to remain with JAS rather than correcting the error and transferring funds to BRI, the fabricated commission entry effectively transferred $237,556 in economic value from Dr. Bonutti's majority ownership in BRI to minority shareholders of JAS, including his brother Boris who held 25% of JAS.  However, one year after this fabricated commission entry effectively transferred the funds to JAS, Dr. Bonutti became 0% owner of JAS and 100% owner of BRI.  With the funds now in the custody of JAS Peter was deprived of both the benefit and use of the funds.

58.    Proximate Cause: But for the fabricated commission entry (as opposed to properly correcting the wire transfer error), the settlement proceeds would have been transferred to BRI, and Dr. Bonutti would have received his 85% share ($2,019,226). This amount represents direct economic harm caused by the fabricated entry, not the original wire transfer error. Adding lost investment returns at 5% annually for six years brings total damages $2,624,994.

### E.    Identity Verification Disaster:  Five Years of Frozen Refunds

59.    In 2018, Dr. Bonutti received a routine IRS identity verification notice (Letter 5071C) and promptly forwarded it to Spracklen. This notice required only a simple verification call—a 15-minute task at most—to confirm the taxpayer's identity.

60.    Instead of making this routine call, Spracklen did not respond. When asked about it, Spracklen told Dr. Bonutti the notice was an "identity theft" issue and the return had to be paper filed. This was a mischaracterization of a routine verification request.

61.    IRS Procedures Confirm DW's Liability. The IRS does not allow credit carryforwards while identity verification is outstanding. Under Internal Revenue Manual 21.6.2.4.2(5), an unanswered Letter 5071C triggers a "refund hold" status (freeze code "I-2"), blocking both refunds and carryforward credits until resolved.

62.    The IRS froze approximately $2,966,827 in refunds and credits that remained inaccessible for nearly two years: a $2,712,584 tax refund from Dr. Bonutti's 2018 return and a $254,243 overpayment credit from the 2020 return.

63.    When Magda Szabo took over the accounting work in 2021 and discovered the identity verification issue, she was able to resolve it promptly through the simple phone call that DW had failed to make two years earlier. The matter was ultimately resolved by Berkowitz Pollack Brant's tax controversy group three years after the relationship with DW was terminated.

64.    Proximate Cause: But for DW's failure to respond to the identity verification notice (a 15-minute call), the $2,966,827 in refunds would not have been frozen for over two years. Dr. Bonutti was required to make additional tax payments for 2019 even though he had substantial overpayments from 2018 that should have been available. Damages include $2,96,683 in lost investment returns at 5% annually, plus $10,000 in professional fees incurred to resolve the issue.

### F.  Unauthorized 2019 Tax Return Filing

65.    In November 2021, more than thirteen months after the extended due date, DW electronically filed Dr. Bonutti's 2019 joint tax return without authorization from either spouse. Neither taxpayer had seen the return, reviewed its contents, or signed Form 8879 (electronic filing authorization) as required by IRS regulations.

66.    This unauthorized filing violated principles set forth in several Code Section including § 7203, § 7216, which makes it unlawful for tax return preparers to file returns without taxpayer consent. The violation carries criminal penalties including fines and imprisonment.  To note, Circular 230 issued by IRS Office of Professional Responsibility sets forth similar standards and allows for investigation and disciplinary action by IRS on such matters.

67.    The unauthorized filing was made specifically to conceal DW's year-long failure to prepare and file the return. In October 2021, when Dr. Bonutti inquired about his 2020 return, Spracklen's response mentioned only the 2020 return not being fully completed (in fact, it was not started) while concealing that the 2019 return remained completely unfiled. Specifically, Spracklen stated the 2020 return had not been completed because he was "unable to obtain a K-1 from a broker," creating the false impression that only the 2020 return was delayed

68.    Damages include $10,000 in professional fees to correct the unauthorized filing, plus the permanent loss of Dr. Bonutti's one-time penalty abatement eligibility for any future issue.

**G. Illinois Residency Failures**

69.    Despite Dr. Bonutti's 2014 move to Florida, DW continued treating him as an Illinois resident through 2016 and systematically over-allocated income to Illinois through 2019. Northern Trust continued issuing Illinois-based 1099s through 2020 because DW never updated the residency information.

70.    Proximate Cause: But for DW's failure to update residency information, income would not have been improperly sourced to Illinois, and Dr. Bonutti would not have paid $309,375 in unnecessary Illinois income tax (calculated as 4.95% on approximately $1,250,000 annually for 2017-2019).

**H. BRI Shareholder Loans and 2023 IRS Audit**

71.    Rather than properly informing and discussing anomalies and S corporation qualification issues relative to non pro rata contributions and documenting such between Dr. Bonutti and BRI or correctly accounting for capital contributions versus distributions, DW created completely fabricated "shareholder loan" entries like their handling of the Lantz settlement commission. These artificial entries were designed to disguise the fact that minority shareholders were receiving inappropriate allocations of items such as losses, and increased capital accounts for capital contributions that were not made.

72.    In 2023, BRI faced an IRS audit focusing on shareholder loans and basis issues directly attributable to DW's pattern of creating artificial accounting. The audit determination letter was dated 10/13/2023

73.    Proximate Cause: But for DW's pattern of creating artificial accounting entries, the IRS audit would not have been triggered. Resolving the audit required $125,000 in

combined costs including approximately $60,000 in internal staff time, $50,000 in external CPA fees, and $15,000 in tax counsel fees.

### I.    PTech Partnership Tax Violations

74.    PTech LLC was carefully structured with Dr. Bonutti holding 100% of the capital interest, reflecting his complete economic investment, while his brother Boris received only a 15% profits-only interest. Boris never contributed real property, intellectual property, or any property to PTech.

75.    Under Rev. Proc. 93-27 and Rev. Proc. 2001-43, profits interest holders cannot receive allocations of partnership losses since they have no capital at risk. All losses must be allocated to capital partners until the partnership generates profits.

76.    Income and other tax allocations must comply with the provisions of IRC § 704(b) and accompanying interpretive regulations that fundamentally require satisfaction of substantial economic effect.  Transitory allocations are prohibited.   Even without issues in terms of following the provisions of the applicable operating agreement, allocations and distributions failed to comply even with these tax fundamental rules.

77.    Despite these clear rules and guidance, DW systematically allocated $488,523 of PTech's tax losses to Boris over the 2017-2020 period. From 2017-2020, PTech had $9.7 million in patent sales. The Partnership K-1s show these improper allocations.

78.    Review of the issued Schedules K-1 shows multiple anomalies in terms of filings that are not in conformity with tax rules such as issuing and creating a capital account to a profits only partner that was never intended or even evidenced with an income allocation and other similar anomalies.

79.    DW also approved $504,960 in cash distributions to Boris during loss years— distributions that violated both the partnership's operating agreement (which limited Boris to

profits-only participation) and IRC § 731(a) (which requires gain recognition on distributions exceeding basis) as well as general tax rules that require both substantial economic effects.

80. But for DW's improper loss allocations, Dr. Bonutti would have received $488,523 in additional tax deductions worth approximately $146,657 at his marginal rate.

81. Proximate Cause: But for DW's approval of improper distributions to Boris, Dr. Bonutti's capital contributions would not have been transferred to a partner with no right to receive them. Total PTech damages exceed $807,000, including the improper distributions of $504,960 plus lost tax benefits plus lost use of funds.

## J.  Conflict of Interest and Dual Representation

82. DW simultaneously represented both Dr. Peter Bonutti and his brother Boris Bonutti as clients, despite their directly adverse financial interests in PTech, JAS, and other entities. This included negotiating a separation agreement the terms of which were misrepresented by DW to Dr. Bonutti.

83. DW never disclosed this conflict of interest to Dr. Bonutti. DW never obtained Dr. Bonutti's informed consent to the dual representation.

84. DW systematically favored Boris's interests at Dr. Bonutti's expense: (a) allocating $488,523 in partnership losses to Boris (who had no economic right to them); (b) approving $504,960 in distributions to Boris (violating the operating agreement and without disclosure to Dr. Bonutti); (c) creating the fabricated commission entry that transferred $2,375,560 from BRI to JAS (where Boris held 25%); and (d) failing to disclose any of these matters and other similar matters to Dr. Bonutti.

85. DW continues to work with Boris as of the date of this complaint. DW did not terminate its relationship with Boris when plaintiffs made this claim.

## K.  Additional Professional Failures

86.     DW systematically undervalued BRI's R&D credits, using a perfunctory "guesswork" approach rather than rigorous analysis. DW never advised Dr. Bonutti to bring in an outside R&D tax credit specialist, nor did DW warn that it lacked specialized resources.

87.     Spracklen had not prior experience in research tax credits.

88.     DW incorrectly reported Dr. Bonutti's foreign financial accounts, erroneously reporting separate investment products as separate accounts. These corrective efforts consumed approximately $20,000 in professional fees.

89.     DW incorrectly advised that BRI was ineligible for Employee Retention Credits, causing a 3-4 year delay in receiving $125,000 in credits and $18,750 in lost investment returns.

90.     Similarly, for all years, DW overstated paid in capital for BRI causing BRI to wrongfully pay over $4,000 annually to the state of Illinois for such overstatement (in lieu of an annual fee of $75 to the state).

## L.  Fraudulent Concealment and Tolling

91.     Defendants engaged in affirmative acts of concealment that prevented Plaintiffs from discovering Defendants' wrongful conduct until 2021-2022.

### *Affirmative Act #1: Unauthorized 2019 Filing to Conceal Year-Long Failure*

92.     Defendants had a duty to disclose by October 15, 2020 that they had not filed the 2019 return. Defendants failed to make this disclosure from October 2020 through October 2021. When Dr. Bonutti inquired in October 2021, Spracklen's response mentioned only the 2020 return, concealing that the 2019 return remained completely unfiled more than a year after its extended due date. During the same period, Spracklen provided Dr. Bonutti with a draft of the 2020 return for review, creating the false impression that DW was actively working on current returns while concealing the 2019 failure. In November 2021, Defendants then filed

18

the 2019 return without authorization specifically to conceal their year-long failure. Filing a tax return without authorization is an affirmative act designed to prevent discovery.

### *Affirmative Act #2: Fabrication of Commission Entry*

93.     Defendants created the fabricated $2,375,560 commission entry in 2017-2018 rather than properly correcting the wire transfer error. Defendants had a duty to disclose this fictitious entry immediately as it materially misrepresented BRI's and JAS's financial condition. Defendants failed to disclose from creation through 2021. The fabricated entry was discovered only during the 2021-2022 forensic review conducted by replacement accountants. Creating false accounting records is an affirmative act of concealment.

### *Affirmative Act #3: Mischaracterization of Identity Verification*

94.     Defendants mischaracterized the routine IRS identity verification notice as an "identity theft" issue to excuse and conceal their failure to respond. A 2021 email from BRI's bookkeeper Laura Arnold with subject "documents found - Dr. Bonutti 2018 return" indicates the identity verification letter had "fallen through the cracks" until the new team discovered it. Making false statements to clients about the nature of IRS notices is an affirmative act of concealment.

### *Affirmative Act #4: Concealment of Lack of Capability*

95.     Defendants continued to accept responsibility for complex work they knew or should have known they could not competently perform. Only in late 2021—after years of systematic errors and missed deadlines—did Wente and Spracklen admit they "lacked the capability" to prepare Dr. Bonutti's tax returns. This admission came only when confronted about unfiled returns and only after the extended filing deadline had passed (October 15, 2021). At no time before this admission did DW inform Dr. Bonutti that his work exceeded the firm's capabilities. DW's concealment of its limitations while continuing to accept fees is an affirmative act of concealment.

*Inability to Discover Through Reasonable Inquiry*

96.     Dr. Bonutti could not have discovered Defendants' wrongful conduct through reasonable inquiry because: (a) Defendants maintained exclusive control over accounting records and tax workpapers; (b) Dr. Bonutti reasonably relied on Defendants' professional expertise; (c) the concealed facts involved technical tax matters within Defendants' specialized expertise; (d) Defendants affirmatively misrepresented facts (identity theft characterization, false gross receipts figures) and created false records (fabricated commission entry); (e) discovery required forensic review by replacement professional accountants with specialized expertise; and (f) Defendants actively concealed their lack of capability until forced to confess.

*Discovery Timeline*

97.     The concealed facts were not discovered until 2021-2022 when Magda Szabo began reviewing DW's work and replacement accountants conducted forensic analysis. Specifically: the fabricated commission entry was discovered during the 2021-2022 forensic review; the unauthorized 2019 filing was discovered when replacement accountants reviewed DW's files in late 2021; the identity verification failure was discovered when the new team found documents that had "fallen through the cracks"; and Wente's admission of DW's lack of capability came only in late 2021 when confronted about unfiled returns.

98.     The limitations period was tolled by fraudulent concealment until these discoveries occurred in 2021-2022.

**M. Tolling Agreement**

99.     On January 27, 2023, the parties entered into a Tolling Agreement that suspended the running of any applicable statutes of limitation and repose during its effective period.

100.    Many claims accrued within two years of January 27, 2023, including: (a) claims related to the 2023 BRI IRS audit; (b) the unauthorized 2019 filing (discovered

November 2021); (c) the fabricated commission entry (discovered during 2021-2022 forensic review); and (d) the identity verification disaster (resolved 2022-2023).

## N. Applicable Professional Standards

101.    Defendants were required to exercise reasonable professional competence consistent with governing statutes and professional standards, including the Illinois Public Accounting Act (225 ILCS 450), AICPA Statements on Standards for Tax Services, and IRS Circular 230.

102.    Illinois law imposes on accountants a duty to exercise "reasonable professional competence" analogous to the duty binding attorneys and surgeons.

## IV.    CLAIMS

### COUNT I
### ACCOUNTING MALPRACTICE (PROFESSIONAL NEGLIGENCE)
*(Against All Defendants)*

103.    Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 102 as if fully set forth herein.

104.    Defendants owed Plaintiffs a duty to exercise reasonable professional competence in providing accounting and tax services.

105.    Defendants breached this duty through negligent professional errors, including but not limited to: filing unnecessary grantor trust returns; failing to identify the TCJA accounting method change opportunity; improperly handling the Lantz settlement proceeds; failing to respond to identity verification; filing returns late; over-allocating income to Illinois; improperly allocating partnership losses; undervaluing R&D credits; incorrectly reporting foreign accounts; and incorrectly advising on ERC eligibility.

106.    Proximate Causation: But-For Causation. As a direct and proximate result of Defendants' negligence, Plaintiffs suffered damages. Each alleged failure has a clear "but-for" causal connection to specific damages: but for filing unnecessary trust returns, $151,586 in

21

Illinois replacement tax would not have been incurred; but for failing to identify the TCJA opportunity, $2,000,000 in refunds would not have been lost; but for improperly handling the Lantz settlement, $2,375,560 would not have been shifted from BRI to JAS; but for failing to respond to identity verification, $2,966,827 in refunds would not have been frozen; but for allocating losses to Boris, $146,657 in tax benefits would not have been lost; but for the audit-triggering entries, $125,000 in audit defense costs would not have been incurred.

107.    As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered damages in an amount exceeding $5,481,999, including: unnecessary Illinois replacement taxes ($151,586); unnecessary professional fees for trust returns ($140,000); lost TCJA refunds ($2,050,000); Lantz settlement misallocation with lost use ($2,296,250); identity

108.    verification delays ($68,304); Illinois residency over-allocation ($309,375); PTech loss misallocations ($146,557); BRI audit defense costs ($125,000); foreign reporting correction ($20,000); ERC delay ($18,750); unauthorized filing correction ($10,000); and additional fees and costs.

WHEREFORE, Plaintiffs respectfully request judgment against Defendants on Count I for compensatory damages exceeding $5,481,999, prejudgment interest, costs of suit, and such other relief as the Court deems just and proper.

## COUNT II
### BREACH OF FIDUCIARY DUTY
*(Against All Defendants)*

109.    Plaintiffs reallege and incorporate by reference paragraphs 1–16, 20–24, 52–58, 74–81, 82–85, 95–96, 120–121, and 125–127, but only to the extent those paragraphs concern the identity of the parties, the nature of the accountant–client relationship, Defendants' role as exclusive accountants and trusted business advisors, Defendants' dual representation of Peter and Boris Bonutti, Defendants' conflicts of interest and favoritism toward Boris (including with respect to the Lantz settlement and PTech allocations and distributions), Defendants'

22

concealment of their lack of capability, and Defendants' misrepresentation and concealment of that lack of capability while continuing to solicit and bill for services.

110.    This Count alleges breach of fiduciary duty based on Defendants' intentional breach of the duty of loyalty—conduct that is distinct from the negligent professional errors alleged in Count I.

111.    Defendants, as Plaintiffs' accountants, owed Plaintiffs fiduciary duties of loyalty, candor, and good faith, including the duty to disclose conflicts of interest, act solely in Plaintiffs' interests, and refrain from self-dealing.

### Breach #1: Undisclosed Conflict of Interest

112.    Defendants simultaneously represented both Dr. Peter Bonutti and his brother Boris Bonutti, whose financial interests were directly adverse. Defendants never disclosed this conflict of interest. Defendants never obtained Dr. Bonutti's informed consent to the dual representation. This is a breach of the duty of loyalty—not a negligent error in professional judgment.

### Breach #2: Systematic Favoritism Toward Adverse Party

113.    While representing both brothers, Defendants systematically favored Boris's interests at Dr. Bonutti's expense: (a) allocating $488,523 in partnership losses to Boris when Boris had no economic right to them; (b) approving $504,960 in cash distributions to Boris without informing Dr. Bonutti (the sole equity partner); and (c) creating the fabricated commission entry that transferred economic value to JAS where Boris held 25%. This systematic favoritism is a breach of the duty of loyalty—not a negligent error in professional judgment.

### Breach #3: Concealment of Lack of Capability

114.    Defendants knew or should have known they lacked the capability to handle Dr. Bonutti's complex tax matters. Defendants concealed this limitation for years while continuing

23

to accept substantial fees. Defendants admitted their lack of capability only in late 2021 when confronted about unfiled returns—after the damage was done. This concealment, while charging for services Defendants knew they could not competently perform, is a breach of the duty of candor and good faith—not a negligent error in professional judgment.

### *Distinct Injuries from Disloyalty (Not Duplicative of Count I)*

115. The intentional disloyalty caused injuries distinct from the negligent errors alleged in Count I. Specifically, Plaintiffs suffered: (a) fees paid to fiduciaries who were secretly working for an adverse party—fees that would not have been paid had the conflict been disclosed; (b) the $504,960 in distributions to Boris that were approved without Dr. Bonutti's knowledge while DW was supposedly representing Dr. Bonutti's interests; and (c) continued retention of disloyal fiduciaries for years longer than would have occurred had DW disclosed its lack of capability.

116. Defendants' conduct was intentional, willful, and wanton, warranting punitive damages. Defendants deliberately concealed the conflict of interest, deliberately favored one client over another, and deliberately concealed their lack of capability—all while collecting fees from the client they were harming.

117. Plaintiffs are entitled to disgorgement of all fees paid to Defendants during periods when Defendants engaged in undisclosed conflicts of interest and concealment of limitations.

WHEREFORE, Plaintiffs respectfully request judgment against Defendants on Count II for: (a) compensatory damages for fees paid during undisclosed conflict (amount to be proven at trial); (b) disgorgement of fees paid during periods of disloyalty; (c) damages for the improper distributions to Boris ($504,960 plus lost use); (d) punitive damages; and (e) such other relief as the Court deems just and proper.

## COUNT III
## ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### *(815 ILCS 505/1 et seq.)*
### *(Against All Defendants)*

118.    Plaintiffs reallege and incorporate by reference paragraphs 1–16, 20–24, and 39–44, but only to the extent those paragraphs describe the identity of the parties, the nature of the accountant–client relationship, Defendants' acceptance and solicitation of the engagement, Defendants' representations regarding their professional capability, Plaintiffs' reliance on those representations, and Defendants' billing for trust and Bonutti Holdings returns that were not legally required and served no legitimate purpose. This Count is limited to Defendants' deceptive acts and omissions in the solicitation and billing of professional services, and does not allege negligence in the performance of those services

119.    This Count is based on Defendants' deceptive business practices in the solicitation and billing of professional services—not on the exercise of professional judgment in providing those services. The Illinois Consumer Fraud Act applies to the business practices surrounding professional services, including misrepresentations of competency and billing for unnecessary services.

### *Deceptive Business Practice #1: Misrepresentation of Capability*

120.    By accepting Plaintiffs' engagement and continuing to perform services for nearly two decades, Defendants represented they possessed the capability to competently perform the services. This representation was deceptive because Defendants knew or should have known they lacked the capability to handle complex matters including international tax compliance, R&D credits, partnership taxation, and S-corporation requirements. This is confirmed by Wente's admission in late 2021 that DW "lacked the capability" to prepare Dr. Bonutti's tax returns—an admission made only after years of accepting fees while failing to perform competently.

25

121.   The misrepresentation of capability is a deceptive business practice in the solicitation and retention of clients—not an exercise of professional judgment. The question of whether DW possessed the capability to handle Dr. Bonutti's work does not require evaluation of professional opinions or tax law interpretations.

**Deceptive Business Practice #2: Billing for Unnecessary Services**

122.   Defendants billed Plaintiffs for preparing tax returns that served no legal purpose and should never have been prepared. Specifically, DW billed approximately $35,000 per year ($140,000 for 2018-2021 alone) for preparing seven unnecessary returns (six grantor trust returns plus Bonutti Holdings partnership return) when Treasury Regulations did not require these filings.

123.   A DW invoice dated May 18, 2020, bills $12,525 for "Preparation of 2017 U.S. and Illinois trust income tax returns for the Boris P. Bonutti 2012 Irrev. Trust"—a return that should never have been prepared.

124.   Billing for unnecessary work is a deceptive business practice—not an exercise of professional judgment. The question of whether a return was legally required under Treasury Regulations is a factual matter that does not involve professional opinion.

**Deceptive Business Practice #3: Concealing Limitations While Accepting Fees**

125.   Defendants accepted engagements and continued to bill for services while knowing they lacked the capability to perform competently. Defendants concealed this limitation from Dr. Bonutti until October 2021, and even then disclosed it only when confronted about unfiled returns. Charging for services while concealing known limitations is a deceptive business practice.

126.   Wente personally participated in and directed the deceptive practices. Wente, as managing partner, directed DW's policies regarding engagement acceptance and the failure to disclose limitations. Wente's admission that DW "lacked capability" establishes personal

knowledge and participation in concealing limitations. Wente is personally liable under the Act.

127. Spracklen personally participated in the deceptive practices by personally billing for unnecessary returns, personally making misrepresentations regarding the identity verification notice, and personally soliciting continued engagement while aware of DW's limitations. Spracklen is personally liable under the Act.

128. As a proximate result of Defendants' violations, Plaintiffs suffered actual damages including: (a) $140,000 in fees paid for unnecessary trust returns (2018-2021); (b) fees paid during periods when DW knew it lacked capability; (c) $151,586 in unnecessary Illinois replacement taxes triggered by the unnecessary filings; and (d) other fees and costs caused by the deceptive practices

129. Under 815 ILCS 505/10a, Plaintiffs are entitled to actual damages, punitive damages, and attorneys' fees.

WHEREFORE, Plaintiffs respectfully request judgment against Defendants on Count III for: (a) actual damages to be proven at trial; (b) punitive damages; (c) attorneys' fees and costs; and (d) such other relief as the Court deems just and proper.

Dated December 5, 2025                    Respectfully submitted,

                                          **PETER M. BONUTTI, M.D.,** *et al*
                                          Plaintiffs,

                                          By:   *Alexander Loftus*

Alexander N. Loftus
LOFTUS & EISENBERG, LTD.
181 West Madison Street, Suite 4700
Chicago, Illinois 60601
Telephone: (312) 889-6625
*Attorneys for Plaintiffs*

27